**STATE ex rel. GROSJEAN, Supervisor of Public Accounts, v. FARMERS' SUPPLY CO., Inc.**
**No. 1355.**

Court of Appeal of Louisiana. First Circuit.
June 11, 1934.

500

Nugier & Gordy, of Abbeville, for appellant.

Gaston L. Porterie, Atty. Gen., and C. O. Dupont, of Plaquemine, for appellee.

ELLIOTT, Judge.

The state of Louisiana, upon the relation of Alice Lee Grosjean, supervisor of public accounts, proceeded against Farmers' Supply Company, Inc., to compel the payment of a tax of 4 cents per gallon on 8,124 gallons of motor fuel purchased by Farmers' Supply Company, Inc., from Lion Oil Refining Company of El Dorado, Ark.

The petition alleges that the shipment was loaded into the storage tanks of Farmers' Supply Company, Inc., at Kaplan, La., for distribution and sale in this state. That said tax is due and Farmers' Supply Company, Inc., refuses to pay same. The amount claimed is $313.21, plus 20 per cent. as a penalty for delinquency, together with 10 per cent. in addition thereon as attorney's fees.

Farmers' Supply Company, Inc., for answer admits receiving the oil and refusing to pay, but denies that the law imposes any tax on the shipment in question.

The case was tried on that issue and the lower court made the rule absolute, held that the defendant owed the tax, and rendered judgment against it in the amount claimed, as well, for the penalty and attorney's fees, and prohibited it from selling fuel oil until the tax, penalties, and attorney's fees had been paid. Defendant has appealed.

The tax is claimed under the provisions of Act No. 6 of 1928, Ex. Sess., § 1 (amended by Act No. 16 of 1932). Other sections of the act provides for the penalty in case of delinquency and attorney's fees in case of suit.

The law imposing the tax reads: "That there is hereby levied a tax of four cents (4¢) per gallon on all gasoline, or motor fuel, sold, used or consumed in the State of Louisiana for domestic consumption, to be collected as hereinafter set forth. The term 'motor fuel' is defined as meaning all volatile gas-generating liquids having a flash point below 110 degrees F."

The law does not provide any particular method to be followed for ascertaining the flash point, and as that was the disputed question in the case, evidence was received on the subject. It appears that the taking of a sample of the oil, the flash point of which is to be tested, is an important part of the proceeding. In this case the sample from the storage tank in which this motor fuel was contained was obtained by H. J. Junot, an employee in the office of the supervisor of public accounts. He employed what is described in a bulletin of the United States Department of Commerce as the "thief bottle" or "beaker method," and obtained what the bulletin describes as a composite sample. By composite sample is meant a sample taken from the bottom, middle, and top of the tank. The rules of the supervisor of public accounts requires a sample of this kind as a basis for testing the flash point. Junot testifies that he personally took a sample of that kind from defendant's storage tank in the presence of Aurelie Lemaire, one of defendant's employees, placed it in a container which he sealed, and transmitted it to plaintiff's office at Baton Rouge.

J. T. Cox, Jr., an employee of plaintiff, a graduate chemist, testified that he received and tested this in his office at Baton Rouge, using what is described by him as the "tag closed cup" method, and that it flashed at 102 degrees Fahrenheit. If the oil in question flashes at 102 F., as found by Cox, defendant owes the tax.

The court evidently acted on this official finding in determining the case.

Lion Oil Refining Company is the manufacturer of the oil in question. The evidence introduced by defendant shows that Lion Oil Refining Company uses another method for taking a sample from a tank car, and also another apparatus for determining the flash point. Its agents and officers testified that a sample of the car, shipped to defendant, was retained before shipping, and that its flash point was 132 Fahrenheit. This tax is not due unless the flash point is below 110 F.

As for the best method of taking a sample from a storage tank, it is our conclusion from the evidence that the "thief bottle" or "beaker method," recommended by the United States Department of Commerce, adopted by the office of supervisor of public

accounts, and used by Junot in taking the sample from defendant's tank at Kaplan, is preferable for the purpose of testing the flash point. Other methods may be just as good, but as the supervisor of public accounts, charged with the collection of the tax in question adopted this method and it seems fair, we think it should be followed for the purpose of testing for the tax in question.

■ It is also our conclusion from the evidence that the "tag closed cup" method recommended by the United States government Department of Commerce, adopted by the office of supervisor of public accounts, and used by J. T. Cox, Jr., plaintiff's chemist, in testing for the flash point of the oil in question, is preferable. The method adopted by the supervisor of public accounts seems fair, and as it is the supervisor's duty to make these tests, the office rules on the subject should be used for the purpose of making the present test, but we do not mean to say that there are no other methods as accurate. The bulletin from the United States Department of Commerce brought up in the record recognizes other methods, and there are no doubt other methods as accurate.

The official report made by plaintiff's chemist shows that the sample which plaintiff's chemist tested was taken April 21, 1933, received April 26, 1933, and tested same day. Cox testifies that after the test was made the sample was kept about 4 days, and then, there being no request to keep it longer, it was destroyed; that such was the custom of his office.

Before it was destroyed, however, the test was rechecked by H. C. Reienberg, and both tests, the original and the recheck, showed a flash point of 102 F. The destruction of this sample placed it out of the power of the defendant to disprove the accuracy of plaintiff's test, except by showing other tests made from other samples.

O. H. Deshontels, defendant's president, testified that he received a letter from plaintiff notifying him of the result of the test, written April 28th, but not mailed until May 4th and received by him on May 5th. That upon getting notice he caused Aurelie Lemaire, his employee, to take a sample from the tank. The testimony of Lemaire shows that he obtained this sample from the pipe used for emptying the tank, which was, we take it, near the bottom. Deshontels says that he took this sample and had it tested by H. A. Dupont, who had practical experience in testing the flash point of fuel oils, and that it flashed at 132 degrees F.

H. A. Dupont, as a witness, testified that he had made a study of the method of determining the flash point of fuel oils, etc. That he made two tests from the sample brought him by Deshontels, using the "tag open cup" method, which he testified was a recognized method and capable of producing a correct flash point. That the first test flashed at 145 and the second at 142. That if the "closed cup" method had been used, the flash would have been at 132 F.

W. M. Carney, chemist of Lion Oil Refining Company, called by defendant, produced a sample which had been preserved by Lion Oil Refining Company from the car before it was forwarded to defendant. This sample was taken by dropping a weighted sample bottle to the bottom of the tank car and drawing it up and down from top to bottom about three times until it filled.

Carney, by permission of the court and in the presence of the court and of two chemists in the employ of the plaintiff, made a test from this sample using the "tag open cup" method, and the sample flashed at 142 and 145 degrees. He testified that if the "closed cup" method had been used the flash would have been 125 degrees F. The reason why a greater degree is required when the "open cup" method is employed was explained by the witnesses and may be gathered from the rules of the United States Department of Commerce on the subject.

Before Carney proceeded to his test, defendant's counsel requested plaintiff's counsel to produce any sample he might have of the fluid in question in order that a test might be likewise made of same.

Plaintiff's counsel, answering for the plaintiff, stated in reply: "It is not the policy of our department to produce in court samples of the liquid taken and it is the policy of our laboratory not to retain samples analyzed excepting by special request, which request was not made in this case. Our department has tried many cases in different courts throughout the state of Louisiana and this is the first time that we have ever been called on to produce a sample in court."

Counsel for defendant then requested counsel for plaintiff, saying: "Will the counsel or his experts make any suggestion whatsoever as to the means, manner or method by which this test is to be made for the benefit of the court."

To which reply was made: "We refuse to offer any suggestions, for the reason we do not recognize the samples offered as being official samples or as being taken in

conformity with the laws of the State of Louisiana, and for the further reason that Mr. Carney is still on the witness stand on his examination in chief and counsel for the plaintiff has not yet had an opportunity to cross-examine him, so as to positively ascertain or determine whether or not his sample can be properly and legally identified with the oil in question, and for the further reason that the other sample offered for analysis marked D 2 is of no significance for the purpose of this trial, since it is admitted by the defendant that it represents a bottom or pipe sample."

The witness Carney was then tendered for cross-examination, and cross-examined before any test was made. After the test had been made the witness Carney was subjected to a lengthy examination and cross-examination concerning the advantage and comparative accuracies of the different methods and apparatus used by plaintiff and Lion Oil Refining Company.

During the course of Carney's examination plaintiff's counsel was requested to "indicate any method, practice or procedure that he regards standard under the laws of the state in the making of this test, coupled with such suggestions that his experts might offer, so that a true test might be ascertained to the courts."

Reply was made: "In answer, counsel for the plaintiff will state that we recognize the A S T M method Closed cup for liquids having a flash point below 175 degrees Fahrenheit, which method has been adopted by our department."

Aurelie Lemaire, witness for defendant, testified that he was present at the time plaintiff's witness Junot obtained the sample from defendant's tank, and that he did not use the "beaker method" in obtaining it; that he instead used a tin can, with which, using his hands, he dipped up the sample out of the top of the tank.

Junot, called in rebuttal, testified firmly that he had not done as claimed by the witness Lemaire, but had used the "beaker method," as stated in his direct testimony.

The attention of plaintiff's chemist was called to the fact that Reienberg had rechecked his test and that the official report did not show this recheck. This was admitted to be the case.

The official report does not show any recheck. The record contains a letter written by Lion Oil Refining Company to superintendent of public accounts at Baton Rouge, La., in which it is said:

"Dear Sir: On April 17th we shipped by car L, U, X–811 Trackter Distillate to Farmers Supply Co., at Kaplan, La. This material was sold as tractor distillate and we have advice from our customer, the Farmers Supply Co., that this material had a flash of 102, which was below 110 required by the law.

"This information certainly was a surprise to us, and yet we do not understand how your test was arrived at. We keep a retained sample on all our material that we ship for 30 days in order to check them in case we have complaint from our customers about the material.

"We also run distillation on material and on sample from the car before we let the material go forward. * * * Our distillation on this car and the retained sample shows that this material has flash of 135 degrees. * * *

"I wish you would take another sample of this material and re-run your distillation, because we do our best to co-operate with all state authorities to avoid any tax evasion on material, and endeavor to make this tractor distillate well within the law. We understand that your law provides that a tax is to be paid when flash is below 110. When shipping our material into Louisiana we usually have 135 flash, or 25 points higher than the law allows in order that there will be no question about the material when you take sample for testing. We try to co-operate with you in all respects on this tax evasion by furnishing you with copy of invoice on every gallon we ship into your state; so we hope you will co-operate with us on this car and relieve our customer of the embarrassment that he now has, due to your first test of this material, by taking another test of this material, and feel sure that if you will do this, you will find that this material is well within the law and not subject to tax."

This letter was received but not answered. Cox, Jr., chemist employed by plaintiff, testified on the trial that he did not regard the test made by defendant's chemist as having any significance, taking the position that the samples upon which his tests were based had not been properly obtained from the storage tank; that his apparatus for testing the flash point was not of the accepted standard and was not in good condition, and that his tests were not made under favorable conditions for testing.

His position and that of plaintiff's counsel is, that the official agent who obtained the sample, and the official test based on the

official sample, should be accepted by the court as showing liability for the tax in question. F. J. Mechlin, a chemist employed by the plaintiff in the laboratory department and a witness in the case, shared this view. The testimony of the four chemists who testified in the case, the method employed, etc., has received our consideration. The burden of proof is upon the plaintiff to establish liability for this tax with reasonable certainty. It is our conclusion that the evidence does not show with reasonable certainty that this shipment of oil has a flash point below 110 degrees Fahrenheit, and is therefore subject to be taxed as claimed by the plaintiff.

We find that under the evidence the right to the tax is involved in grave and serious doubt. The oil has no doubt been sold, and it would therefore serve no purpose to order new tests.

For these reasons, the judgment appealed from is annulled, avoided, and set aside, and plaintiff's demand is now rejected as in case of nonsuit.